UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

ANGELICA ROCHA HERRERA,  ) Civil Action No.: 7:14-CV-2255-BHH
                        )
                Plaintiff, )
                        )
        vs.             )
                        )        **Opinion and Order**
JOHN L. FINAN, et al.   )
                        )
                Defendants. )
_____ )

    This matter is before the Court on Plaintiff's motion for partial summary judgment and for a permanent injunction (ECF No. 38) and Defendants' motion for summary judgment (ECF No. 40). For the reasons set forth in this Order, Plaintiff's motion is denied, Defendants' motion is granted, and the suit is dismissed in its entirety.

## FACTUAL AND PROCEDURAL BACKGROUND

    Plaintiff Angelica Rocha Herrera ("Plaintiff" or "Ms. Rocha") is a U.S. citizen who was born in Texas and has lived in South Carolina nearly her entire life. During the process of applying to two different South Carolina post-secondary education institutions, South Carolina law and regulations were applied in a manner that designated her as a non-resident for college tuition and scholarship purposes, despite over fifteen (15) years of continuous residency in South Carolina. Plaintiff asserts that she was treated fundamentally differently than similarly situated U.S. citizens and denied residency based solely on the unlawful immigration status of her parents. The Commissioners of the South Carolina Commission on Higher Education (the "Commission," "CHE," or "Defendants") administer South Carolina's state tuition and

financial aid regulatory framework, including promulgation of the regulations that were applied to preclude Plaintiff from eligibility for in-state tuition and other financial benefits otherwise afforded to U.S. citizens who are residents of South Carolina. Defendants assert that they did not make the residency determination in Plaintiff's case, and indeed do not make the residency determination in any particular case. They further argue that they cannot be held responsible when financial aid and admissions personnel at various South Carolina colleges and universities apply the regulations they promulgate in a putatively unconstitutional manner. Curiously, neither college to which Plaintiff applied and from which she received a determination of non-residency is a party to this lawsuit.

In her motion, Plaintiff asserts that summary judgment is appropriate on the question of Defendants' liability for alleged unconstitutional withholding of residency status, but argues that the damages Plaintiff suffered as a result include questions of fact properly left for trial. Moreover, Plaintiff avers that as a matter of law, the Court should permanently enjoin Defendants from unconstitutionally withholding residency status to otherwise qualified U.S. citizens. In their motion, the Defendants present a number of separate and independent bases for summary judgment, including the fact that not a single named Defendant, nor "the Commission" as a whole, was involved in the decision to withhold residency status from Plaintiff. The Defendants assert that the regulations promulgated by the Commission merely create a rebuttable presumption that a dependent student's residency mirrors that of their parent(s) and do not target students whose parents are undocumented in particular. Moreover, Defendants aver that the same statutory and regulatory scheme that Plaintiff is now challenging as unconstitutional has been applied to grant residency to another student in *exactly* the

same position as Plaintiff, a U.S. citizen dependent student whose parents are undocumented immigrants.

Plaintiff filed her complaint on June 10, 2014, alleging that the Chairman and individual commissioners of the CHE, in their individual and official capacities, violated guarantees of Equal Protection, Substantive Due Process, and Privileges and Immunities included within the Fourteenth Amendment to the U.S. Constitution. (*See* ECF No. 1.) Her fundamental claim is that by administering residency determination regulations in a manner to classify U.S. citizens as non-residents of South Carolina on the basis of their parents' immigration status Defendants have betrayed these core protections of the Fourteenth Amendment. As such, pursuant to 42 U.S.C. § 1983, Plaintiff seeks a declaration from this Court that S.C. Code § 59-112-20 and S.C. Code of Regs. §§ 62-602(C) and 62-603(B) are unconstitutional on their faces and/or as applied to Plaintiff. Plaintiff further seeks restitution, damages, and an award of costs and attorneys' fees.

Plaintiff was born in Dallas, Texas, and moved to Greenville, South Carolina as a toddler. (Rocha Decl. ¶¶ 2-3, ECF No. 38-2.) She has spent virtually her whole life living with her family in South Carolina. (*Id.* at ¶¶ 3-4.) Her family pays taxes in South Carolina as residents. (*Id.* at ¶ 8.) Plaintiff attended Greenville public schools for her entire primary and secondary education career. (*Id.* at ¶ 4.) She has a South Carolina driver's license. (*Id.* at ¶ 6; *see also* Castillo Decl. Ex. I, ECF No. 39-9 (South Carolina Department of Motor Vehicles form indicating proof of state residency as prerequisite for issuance of a driver's license and DMV form indicating proof of state residency requirement for a driver's license).) For all intents and purposes, South Carolina is

Plaintiff's home state in the colloquial sense of the term.

As a result of her academic success, Plaintiff was awarded a $2,000 yearly scholarship by the School District of Greenville County, called the Sirrine Scholarship. (Converse Dep. Exs. 20, 25, ECF No. 39-6 at 5-6; Castillo Decl. Ex. H., ECF No. 39-8.)[1] Plaintiff also met the academic requirements for the South Carolina Legislative Incentive for Future Excellence ("LIFE") Scholarship, which provides South Carolina residents up to $5,000 scholarship, renewable up to four years. (*See* Converse Dep. Exs. 4, 5, ECF No. 39-6 at 3-4); *see also* S.C. Code §§ 59-149-10(E), 59-149-50(D); S.C. Code of Reg. §§ 62-1200.10(A)(3), 62-1200.65(A).

Plaintiff applied to and was accepted into the Center for Educator Recruitment, Retention and Advancement ("CERRA") Teaching Fellowship, a special program offered to South Carolina residents who have demonstrated high academic achievement, a history of public service, and a desire to teach in South Carolina. (Rocha Decl. ¶ 10, ECF No. 38-2; Castillo Decl. Ex. U, ECF No. 39-21.) The CERRA Teaching Fellowship program is available at a small selection of higher education institutions in South Carolina, including the University of South Carolina-Upstate ("USC-Upstate"). (Castillo Decl. Ex. U, ECF No. 39-21.) Fellows participate in specialized educational and professional development opportunities, and receive up to $6,000 annually in financial aid for four years. (*Id.*) In exchange for these unique opportunities and the financial assistance, CERRA fellows commit to teaching in South Carolina primary or secondary schools for at least four years. (*Id.*)

During the process of collegiate enrollment at USC-Upstate and Converse

---

[1] Plaintiff has gone into some detail about Ms. Rocha's academic achievements. Though not relevant to determination of the motions before the Court, the Court sincerely congratulates Ms. Rocha. She clearly applied herself well during her high school career, and the Court commends her accordingly.

College ("Converse"), Plaintiff was classified as a non-resident for tuition and scholarship purposes. Plaintiff attempted to attend both USC-Upstate and Converse as a resident of South Carolina eligible for instate tuition, the LIFE Scholarship, and other state aid. By way of their interpretation of South Carolina laws and CHE regulations, admissions and financial aid personnel at both institutions determined that Ms. Rocha was not a state resident because she was a dependent of her parents, whose immigration status precluded a positive residency finding.[2] (*See* Rocha Dep. Ex. 3, ECF No. 39-1 at 9; Collins Dep. Exs. 5, 8, ECF No. 39-5 at 5-6.) Plaintiff is unable to produce any documentation to substantiate lawful immigration status on the part of her parents because there is none. (*See* Rocha Cont'd Dep. 8:9-21, 12:9-14:15, ECF No. 39-2.) Plaintiff asserts that she submitted various documents, such as a utility bill, her birth certificate, and her parents' tax documents, to financial aid personnel at USC-Upstate and Converse in an attempt to provide *bona fides* of residency in South Carolina, but that these efforts were to no avail. (Rocha Decl. ¶¶ 23-26, 29-30, 34, 39-40, ECF No. 38-2.)

Plaintiff first tried to enroll at USC-Upstate. (Rocha Decl. ¶ 11, ECF No. 38-2.) Based upon her application information, USC-Upstate did not make a final determination of Plaintiff's South Carolina residency at that time and considered it pending. (*See* Castillo Decl. Exs. Q, R, ECF Nos. 39-17, 39-18.) Plaintiff next completed an electronic residency application on the USC-Upstate student portal in an attempt to provide additional information to establish state residency. (Rocha Decl. ¶¶ 13-15, ECF No. 38-2; USC-Upstate Dep. Exs. 3, 15, ECF No. 39-4.) On the electronic residency application, Plaintiff indicated that her father held Georgia driver's license no. 7546957

---

[2] See explication of applicable statutes and regulations *infra*.

issued on July 5, 2011. (USC-Upstate Dep. Exs. 15, ECF No. 39-4 at 12.) When questioned about the Georgia driver's license in a deposition, Plaintiff stated, "I was told to put any information in there because I couldn't continue my enrollment process if I didn't fill that portion out." (Rocha Cont'd Dep. 20:10-20:23, ECF No. 40-3.) Defendants assert that later in the deposition Plaintiff admitted that the information regarding the Georgia driver's license was false. (ECF No. 40-1 at 22; *see* Rocha Cont'd Dep. 20, 22.)[3] Plaintiff alleges that on two separate occasions USC-Upstate personnel informed her that the applicable law and regulations precluded them from classifying her as a South Carolina resident without her producing all the information requested in the residency application, including documentation of her parents' lawful immigration status. (*See* Rocha Decl. ¶¶ 19-26, 33-34, ECF No. 38-2; Castillo Decl. Ex. S, ECF No. 39-19.) Plaintiff does not remember any USC-Upstate staff member or document informing her of the option to appeal the residency determination. (Rocha Decl. ¶ 35, ECF No. 38-2.)

In her deposition, Donette Stewart, who was the Associate Vice Chancellor for Enrollment Services at USC-Upstate during the time period in question, indicated her view that the decision to deny Ms. Rocha residency was likely heavily influenced by the submission of an out-of-state driver's license for the parent on whom Ms. Rocha was dependent. (USC-Upstate Dep. 218:25-219:17, ECF No. 40-4.) When asked what the non-residency determination was specifically based on, she referred to the electronic residency application completed by Plaintiff, stating:

> Well, I think the decision when Star updated the residency screen was based on an out-of-state driver's license and, on the screen where you list that you file South Carolina taxes and then you list what state your parents live in and nothing was listed. So I think it's a general review of the

---

[3] As a result of what appears to be a clerical error, page 21 of Ms. Rocha's continued deposition is missing from the attachments to Defendants' motion for summary judgment. (*See* ECF No. 40-3 at 2-3.)

information, that would be why she determined it to be nonresident.

(*Id.* 219:6-219:12.) Ms. Stewart later described the significance of a driver's license submitted during the residency determination process at USC-Upstate: "[I]t's one of the items on the list for what qualifies for someone to be a South Carolina resident, legal resident. The *absence of it in another state*, and having the state of South Carolina." (*Id.* 240:12-240:19 (emphasis added).) When asked if the University made any determination regarding whether the person upon whom Ms. Rocha was dependent was a citizen of the United States, Ms. Stewart responded, "I could not find any information in the documentation I had. And I looked through, you know, every file that we had. And I couldn't find anything on that." (*Id.* 219:18-219:23; *see also id.* 240:6-240:11.) When asked whether she or anyone at USC-Upstate consulted with anyone at the CHE regarding Ms. Rocha's residency determination, Ms. Stewart indicated that she was not aware of any such communication and could not find any documentation in that regard. (*Id.* 234:8-234:17.) Finally, when asked to explain the process of appealing a residency determination at USC-Upstate, Ms. Stewart stated:

> If the student doesn't agree with the decision, they would communicat[e] that with a staff member, and the staff member would discuss the situation with me, you know, just providing whatever information the student had submitted to make a decision. And if I have questions about whether I feel like the classification was appropriate, I would either contact [the] USC residency officer, or I would contact Gerrick Hampton at CHE.

(*Id.* 235:9-235:20.) Ms. Stewart could not find any information about an appeal by Ms. Rocha, and does not believe she was ever consulted on Ms. Rocha's case. (*Id.* 235:21-235:25.)

Ultimately, USC-Upstate determined Plaintiff was not a resident of South Carolina for tuition and scholarship purposes. (*See* Rocha Dep. Ex. 3, ECF No. 39-1 at

9.) This determination doubled the cost of tuition and simultaneously eliminated between $8,000 and $10,500 in annual state scholarships and grants,[4] making USC-Upstate, according to Plaintiff, unaffordable for her and her family. (Rocha Decl. ¶ 27, ECF No. 38-2; Castillo Decl. Ex. X, ECF No. 39-24.) Ms. Rocha's financial inability to attend USC-Upstate also meant that she would not be able to join her cohort within the CERRA Teaching Fellowship program, and she submitted a resignation form to that effect. (Rocha Decl. ¶¶ 31, 36, ECF No. 38-2; USC-Upstate Dep. Ex. 10, ECF No. 39-4.)

Plaintiff next approached Converse, explained what happened with her initial plan to enroll at USC-Upstate, and provided necessary enrollment and financial aid documents to begin the process of enrolling at Converse. (Rocha Decl. ¶¶ 29-30, 38, ECF No. 38-2.) The Director of Financial Aid at Converse, Ms. Peggy Collins, reached out to the CHE via email to inquire whether Plaintiff could be considered for state financial aid notwithstanding her parents' immigration status. (CHE Dep. Ex. 6, ECF No. 39-3.) Ms. Collins stated her question as: "Dependent student is a US Citizen but her parents are not citizens nor are they permanent residents. Is the student eligible for state scholarships?" (*Id.*) She further noted, "My interpretation of the regs says since she is a dependent she is not eligible. Or am I being too strict?" (*Id.*) Ms. Collins sent this email on July 22, 2013. (*Id.*)

The next day, Mr. Gerrick Hampton, Assistant Director, Student Services Division

---

[4] Plaintiff was otherwise eligible for a $5,000 LIFE Scholarship each year, a $2,500 LIFE Scholarship Enhancement each year from sophomore to senior year, and approximately $3,000 from the South Carolina Tuition Grant each year. (*See* Castillo Decl. Exs. L, V, W, ECF Nos. 39-12, 39-22, 39-23; USC-Upstate Dep. Ex. 14, ECF No. 39-4 (indicating Ms. Rocha's selection of secondary teacher of math, a LIFE Scholarship Enhancement eligible major).)

and SC GEAR UP Program Manager at the Commission,[5] responded by noting that they "were wondering when this [scenario] might come up," and asking a series of follow up questions about the dependent student's (Ms. Rocha) individualized circumstance. (*Id.*) Mr. Hampton further stated, "Sorry for the questions, and ultimately we may need to have a phone convo about this, but I want to get some facts first." (*Id.*) Ms. Collins, in turn, provided relevant particulars about Plaintiff's situation that might weigh for or against Plaintiff's eligibility. (*Id.*) Over the phone, Mr. Hampton provided guidance to Ms. Collins, referencing the particular facts about Plaintiff's situation that they exchanged by email, and discussing the need for Converse to put Plaintiff through an appeal of the residency decision. (CHE Dep. 63:1-64:12, ECF No. 39-3.) According to Mr. Hampton, he advised Ms. Collins that "whatever determination the institution came up with . . . or what the appeal committee came up with is what she would need to communicate to [Plaintiff]." (*Id.* at 64:6-64:12.)

Converse ultimately determined that Plaintiff was not eligible for certain state scholarships and financial aid due to a lack of residency. (*See* Collins Dep. Exs. 5, 8, ECF No. 39-5; Converse Dep. Ex. 20, ECF No. 39-6.) On a handwritten worksheet documenting Plaintiff's various sources of financial aid at Converse for the 2013-2014 school year there is a note stating: "Parent not citizen." (Collins Dep. Ex. 5, ECF No. 39-5.) On a similar worksheet for the 2014-2015 school year next to entries SCTG (indicating South Carolina Tuition Grant) and LIFE the handwritten note reads: "Parents not legal res." (Collins Dep. Ex. 8, ECF No. 39-5.) In January 2014, approximately six months after Converse denied Plaintiff residency for scholarship and financial aid purposes, Mr. Hampton reached out to Ms. Collins and asked what ultimately happened

---

[5] Mr. Hampton is not a named defendant in this lawsuit.

with the residency determination. (CHE Dep. Ex. 6, ECF No. 39-3 at 21 ("What ultimately happened with this student? Were they awarded LIFE/SC HOPE/SCTG?").)

At the time of the filing of her motion for summary judgment, Plaintiff alleged that she was still considered a non-resident of South Carolina for tuition and financial aid purposes based solely on her parents' immigration status. (ECF No. 38-1 at 15.) As a result, Ms. Rocha averred, she and her family have had to pay significantly larger amounts for her to attend college at an institution that does not have the same quality of educational offerings in her desired field of specialization, and she lost the unique opportunity to be part of the CERRA Teaching Fellowship program. (*See* Rocha Dep. 71:2-72:16; 75:12-76:7, ECF No. 39-1; USC-Upstate Dep. Ex. 10, ECF No. 39-4.)

Plaintiff and Defendants each moved for summary judgment (ECF Nos. 38 & 40). Responses (ECF Nos. 43 & 44) and replies (ECF Nos. 46 & 47) were filed by both parties. Plaintiff further submitted a supplement to its reply (ECF No. 49) in order to have her expert swear by affidavit to his previously unsworn report regarding the value of teacher education and the CERRA Teaching Fellowship program. Defendant further submitted the affidavit of Julie Carullo (ECF No. 51-1), Director of External Affairs for the CHE, and an accompanying guidance document approved by the CHE on October 1, 2015, entitled "Residency for Tuition/Fee and State Scholarship/Grant Purposes of U.S. Citizen Students with Undocumented Parents" (ECF No. 51-2). The guidance document was communicated to the presidents of all South Carolina public and independent colleges and universities on October 2, 2015, by way of a memorandum issued by Gary Glenn (ECF No. 51-3), Interim Executive Director of the CHE. Plaintiff next filed a response (ECF No. 52) to Ms. Carullo's affidavit and the guidance document

therein, and the response included the supplemental declaration of Ms. Rocha, dated

October 27, 2015, stating:

> 2. Converse College recently informed me, for the first time, that I am deemed a state resident. By August 31, 2015, Converse College had updated my awards package to include the LIFE Scholarship and South Carolina Tuition Grant for this academic year.

> 3. To date, I have not been awarded any retroactive LIFE Scholarship awards for my freshman or sophomore years.

(ECF No. 52-1 at 1.) On November 24, 2015, Plaintiff filed a notice of change of fact in

support of their motion for summary judgment. (ECF No. 54.) By way of the notice,

Plaintiff informed the Court that she received a check for $7,259 in retroactive payment

for LIFE Scholarship awards. (*Id.* at 1; Rocha 2d Suppl. Decl. at ¶ 2, ECF No. 54-1.)

The check for $7,259 included a $5,000 retroactive LIFE Scholarship award for 2013-

2014, plus $5,000 for a retroactive LIFE Scholarship award for 2014-2015, minus

$2,741 to refund Converse for part of the Presidential Scholarship they offered Plaintiff

in 2014-2015.[6] (Rocha 2d Suppl. Decl. at ¶ 3, ECF No. 54-1.) In the notice, Plaintiff

explained various reasons why, in her view, the retroactive awards reduced but did not

eliminate the alleged damages she has incurred as a result of being classified as a non-

resident, and why she believes she is still entitled to compensatory and injunctive relief.

(ECF No. 54 at 1-2.)

## **LEGAL AND REGULATORY BACKGROUND**

In South Carolina, a dependent student is eligible for in-state tuition rates if the

person(s) upon whom they are dependent is(are) eligible for in-state rates. (CHE Dep.

180:3-12; ECF No. 39-3.) The burden of proving eligibility for in-state tuition rates is

---

[6] Plaintiff indicated in a previous declaration that Converse attempted to supplement the institutional financial aid package they offered her in order to make up for the loss of the LIFE Scholarship funds due to her residency determination in 2013. (Rocha Decl. ¶ 40, ECF No. 38-2.)

always on the student:

> Each State Institution shall designate an official to administer the provisions of this chapter. Students making application to pay tuition and fees at in-state rates shall have the burden of proving to the satisfaction of the aforesaid officials of State Institutions that they have fulfilled the requirements of this chapter before they shall be permitted to pay tuition and fees at such rate.

S.C. Code § 59-112-80. For independent persons and their dependents, domicile and residence for purposes of in-state tuition can be demonstrated by those persons either making South Carolina their permanent home for at least twelve months, or by living in South Carolina for less than twelve months and having full-time employment in the state. S.C. Code § 59-112-20(A), (B). "The residence and domicile of a dependent minor [is] *presumed* to be that of the parent of such dependent minor." S.C. Code § 59-112-20(D) (emphasis added). A "dependent" is defined, in relevant part, as "one whose financial support is provided not through his own earnings or entitlements, but whose predominant source of income or support is payments from a parent, spouse, or guardian, and who qualifies as a dependent or an exemption on the federal tax return of the parent, spouse, or guardian." S.C. Code § 59-112-10(G). A "minor" is defined as "a person who has not attained the age of eighteen years". S.C. Code § 59-112-10(H). Moreover, persons who cannot establish that they are lawfully present are barred from eligibility for in-state rates: "An alien unlawfully present in the United States is not eligible on the basis of residence for a public higher education benefit including, but not limited to, scholarships, financial aid, grants, or resident tuition." S.C. Code § 59-101-430(B).

Taking the above statutory provisions together, all dependent U.S. citizen students are *presumed* not to be South Carolina residents for tuition purposes if they

are dependent upon persons who cannot demonstrate they have a lawful immigration status or, in the case of dependent minors, their parents cannot demonstrate a lawful immigration status. Furthermore, residency determinations for other forms of South Carolina state financial aid, including the LIFE Scholarship, rely on the determination of residency for tuition purposes. *See, e.g.*, S.C. Code § 59-149-20(B) (requiring a student seeking a LIFE Scholarship as a freshman at a public or independent South Carolina institution to be, *inter alia*, "classified as a resident of South Carolina for in-state tuition purposes under Chapter 112 of this title at the time of enrollment at the institution").

The CHE, established in 1967, is a body within the South Carolina government that "provides statewide policy direction, management, and oversight of the state's higher education enterprise." (Castillo Decl. Ex. M., ECF No. 39-13 at 2.) Among other responsibilities, the Commission "[o]versees [the] administration of student financial aid to provide statewide equity of awards and consistency of selection criteria." (*Id.*) Consistent with its statutorily defined mission set, the Commission has promulgated regulations specifically related to the determination of residency for tuition and scholarship purposes. *See* S.C. Code § 59-112-100 (granting authority to "prescribe uniform regulations").

CHE regulations dictate that the LIFE Scholarship uses the same residency criteria used in a residency determination for tuition purposes. *See* S.C. Code of Reg. § 62-1200.5(NN) (defining "South Carolina resident" as an individual who satisfies the requirements of residency in accordance with the state statute for tuition and fees, S.C. Code § 59-112-10, and all related guidelines and regulations). Under the applicable regulations, a "resident" for tuition and fees purposes is defined as "an independent

person who has abandoned all prior domiciles and has been domiciled in South Carolina continuously for at least twelve months immediately preceding the first day of class of the term for which resident classification is sought . . . ." S.C. Code of Reg. § 62-602(N). Furthermore, "the residence and domicile of a dependent person [is] *presumed* to be that of their parent, spouse, or guardian." S.C. Code of Reg. § 62-603(B) (emphasis added). A "dependent person" is defined as "one whose predominant source of income or support is from payments from a parent, spouse, or guardian, who claims the dependent person on his/her federal income tax return." S.C. Code of Reg. § 62-602(C). One discernable difference between these regulations and the aforementioned statutes is that the regulations do not limit the presumption of mirrored residency to "dependent minors," rather the regulatory presumption applies to all "dependent persons."

Similar to the statutory scheme, the regulatory framework categorically excludes "non-resident aliens" from eligibility to receive state sponsored scholarships, though certain specified visa classifications may make non-resident aliens eligible for in-state tuition. S.C. Code of Reg. § 62-604(A); (*see also* Castillo Decl. Ex. N, ECF No. 39-14 (listing authorized visa categories)). A "non-resident alien" is defined as "a person who is not a citizen or permanent resident of the United States," by virtue of which status such a person "generally [does] not have the capacity to establish domicile in South Carolina." S.C. Code of Reg. § 62-602(K).

Thus, much like the statutes already described, the regulatory scheme pertaining to in-state tuition and state sponsored scholarships directs South Carolina colleges and universities to *presume* that dependent U.S. citizens are not residents of South Carolina

if the person who provides their predominant source of income or support cannot demonstrate lawful immigration status. At the time cross-motions for summary judgment were filed, the Commission had not yet promulgated any regulation or issued any formal guidance explicitly stating that this presumption could be rebutted. However, all South Carolina colleges and universities were and are required by regulation to establish an appeals process to be utilized by any student who disagrees with the initial residency determination made by the relevant institution:

> Each institution will develop an appeals process to accommodate persons wishing to appeal residency determinations made by the institution's residency official. Each institutions appeal process should be directed by that institutions primary residency officer, in conjunction with those individuals who practice the application of State residency regulations on a daily basis. The professional judgment of the residency officer and administrators will constitute the institutional appeal process. Neither the primary residency official nor appellate official(s) may waive the provisions of the Statute or regulation governing residency for tuition and fee purposes.

S.C. Code of Reg. § 62-612(B). In a manner similar to the statutory scheme regarding residency, CHE regulations place the burden of proof on the student to establish eligibility for in-state tuition rates and state scholarships:

> If a person asserts that his/her domicile has been established in this State, the individual has the burden of proof. Such persons should provide to the designated residency official of the institution to which they are applying any and all evidence the person believes satisfies the burden of proof. The residency official will consider any and all evidence provided concerning such claim of domicile, but will not necessarily regard any single item of evidence as conclusive evidence that domicile has been established.

S.C. Code of Reg. § 62-605(B).

In a Rule 30(b)(6) deposition dated June 10, 2015, Mr. Gerrick Hampton on behalf of CHE testified to not having specific guidelines to determine the relative weight to be placed on a dependent student's parent's immigration status in the event a

student was denied residency based on the parent's status and subsequently appealed that denial; rather, Mr. Hampton stated, "if a student is denied on that reason, the burden of proof is on the student," "the institution would have to make that determination in an appeal situation," and "the institution would consider the weight of the evidence the student provides and the commission does not have a listing, a rating, or how they might consider that." (CHE Dep. 177:5-178:4, 181:2-182:14, ECF No. 39-3.) A "Frequently Asked Questions Regarding SC Residency" form published by the Commission during the time period relevant to the allegations stated simply, "If a parent, guardian, or spouse provided more than half of [a] student's support for the past twelve months, the student is considered dependent and it is the parent, guardian, or spouse that must meet the residency requirements;" there is no comment regarding rebutting the presumption contained in the relevant statutes and regulations, nor is there any comment regarding dependents whose parent, guardian, or spouse cannot prove lawful immigration status. (CHE Dep. Ex. 5, ECF No. 39-3 at 17.) The form also answers the question, "***Where do I submit an appeal if I do not agree with the institution's decision?***" in the following manner: "Students wishing to appeal a decision must follow the grievance procedures established by the college or university to which they apply." (*Id.* at 19 (emphasis in original).)

Email evidence obtained during the discovery process revealed that on at least four occasions, Mr. Hampton of the CHE responded to individual inquiries made by college financial aid officers attempting to determine residency in cases where the issue was whether a particular dependent student should be classified as a non-resident on the basis of his or her parents' immigration status. (*See, e.g.*, CHE Dep. Exs. 6, 7, 8, 9,

ECF No. 39-3 (inquiries from financial aid officers).) A letter dated in April 2013, demonstrates that the Commission was fielding inquiries of this type in and around the same time period Ms. Rocha was seeking residency status for her freshman year of college. (*See* Castillo Decl. Exs. O, P, ECF Nos. 39-15, 39-16.) Representatives of the Commission have regularly responded to such inquiries by deferring residency classification determinations to the colleges and universities themselves, and encouraging consideration of the specific facts presented in each situation and throughout each institution's appeals process. (*See* CHE Dep. Exs. 6, 7, 9, ECF No. 39-3; Castillo Decl. Ex. P, ECF No. 39-16.)

During the pendency of this litigation, on October 21, 2015, the CHE approved a guidance document entitled, "Residency for Tuition/Fee and State Scholarship/Grant Purposes of US Citizen Students with Undocumented Parents." (Carullo Decl. Ex. A, ECF No. 51-2.) The stated purpose of the document is to provide guidance to institutional residency officials and institutional residency appeal committees that encounter the scenario where U.S. citizen students are dependent on a parent or guardian who has undocumented immigration status. (*Id.* at 2.) In providing this guidance, the Commission reiterates, "South Carolina statutory law places the responsibility for making residency determinations on the designated residency official for each institution," and "the Commission is not attempting to usurp or assume the ultimate authority of colleges and universities in making residency determinations." (*Id.*) The Commission recommends that in situations where a U.S. citizen dependent student is presumed to be a "non-resident alien" for tuition and scholarship purposes due to a parent or guardian's immigration status, the analysis should not stop there, rather:

> [T]he student should be informed that state law only presumes that he/she is a "non-resident alien" like the parent or guardian on whom he/she is dependent. That presumption is *rebuttable*, and the burden remains on the student to rebut that presumption, if possible, by presenting evidence to establish that that student is entitled to in-state residency status notwithstanding the undocumented status of his/her parent or guardian.

(*Id.* (emphasis in original).) The Commission goes on to provide a non-exhaustive list of various forms of information that may be obtained from the dependent student in order to rebut the presumption. (*Id.* at 3 (listing seven specific items and/or categories of information).) Finally, the Commission recommends that the institutional residency official weigh all of the evidence presented in order to make a determination whether a U.S. citizen student in this scenario is domiciled in South Carolina, cautioning:

> Students with an undocumented parent or guardian should not gain any advantage over other students whose parent or guardian on whom they are dependent qualify as a "non-resident," such as a resident of another state or country. *However, a U.S. citizen student who can establish domicile in South Carolina should not be denied in-state residency status on the basis of his/her parent's undocumented status.*

(*Id.* (emphasis added).)

## STANDARD OF REVIEW

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

Accordingly, to prevail on a motion for summary judgment, the movant must demonstrate that: (1) there is no genuine issue as to any material fact; and (2) that he is entitled to judgment as a matter of law. As to the first of these determinations, a fact is deemed "material" if proof of its existence or non-existence would affect disposition of the case under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue of material fact is "genuine" if the evidence offered is such that a reasonable jury might return a verdict for the non-movant. *Id.* at 257. In determining whether a genuine issue has been raised, the court must construe all inferences and ambiguities against the movant and in favor of the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).

Under this standard, the existence of a mere scintilla of evidence in support of the non-moving party's position is insufficient to withstand a summary judgment motion. *Anderson*, 477 U.S. at 252. Conclusory allegations or denials, without more, are likewise insufficient. *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248.

## **DISCUSSION**

The Court would begin by stating that it is sympathetic to Ms. Rocha's

experience in being denied South Carolina residency twice over, waiting two years to have her resident status for state scholarship purposes restored, losing the unique opportunity to be part of the CERRA Teaching Fellowship program, losing the ability to attend USC-Upstate, and having to pay more money than she otherwise would have to attend a college whose academic and programmatic offerings are not as well tailored to her preferred field of study as the university she originally envisioned herself attending.[7] Nevertheless, Plaintiff's 42 U.S.C. § 1983 allegations against the Commissioners of the CHE fail for the simple reason that neither the Commissioners themselves, nor the regulations they promulgate, produced the denial of residency of which Plaintiff complains. Indeed, no matter how sympathetic the Court is to Plaintiff's plight, under the law associated with § 1983 litigation, the Court cannot find in Plaintiff's favor against Defendants that did not harm her.

## I. Statues and Regulations Being Challenged; Facial and As Applied Challenges

Plaintiff seeks a declaration by this Court that S.C. Code § 59-112-20 and S.C. Code of Regs. §§ 62-602(C) and 62-603(B) are unconstitutional on their faces and/or as applied to Ms. Rocha. Plaintiff further petitions the Court to permanently enjoin Defendants from classifying any U.S. citizen student who resides in South Carolina as a nonresident for tuition and financial aid determinations based on his or her parent's federal immigration status, in order to prevent putative ongoing and irreparable harms. Next, Plaintiff seeks restitution and damages incurred as a result of being classified as a nonresident for purposes of tuition and financial aid determinations. Finally, Plaintiff seeks an award of costs, expenses, and attorneys' fees under 42 U.S.C. § 1988. (ECF

---

[7] The reader will, however, keep in mind that during the pendency of this litigation Ms. Rocha has arguably been made whole with respect to the LIFE Scholarship in particular.

No. 1 at 11; ECF No. 38-1 at 7.) Plaintiff's theory of the case is that Defendants administer and control the regulatory scheme pertaining to residency determinations in such a manner as to deny residency status to dependent students who are U.S. citizens solely on the basis of their parent(s)' unlawful immigration status. (ECF No. 1 at 9-11; ECF No. 38-1 at 13, 15.)

A facially unconstitutional statute or regulation can generally be described as one for which no application would meet constitutional muster. *See Sabri v. United States*, 541 U.S. 600, 609 (2004). "Facial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of 'premature interpretation of statutes on the basis of factually barebones records.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 450 (2008) (quoting *Sabri*, 541 at 609). "Under the well recognized standard for assessing a facial challenge to the constitutionality of a statute, the Supreme Court has long declared that a statute cannot be held unconstitutional if it has constitutional application." *United States v. Moore*, 666 F.3d 313, 318 (4th Cir. 2012) (citing *Washington State Grange*, 552 U.S. at 449). "A facial challenge to a legislative [a]ct is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1989). Moreover, "[t]he fact that [a legislative act] might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid . . . ." *Id.* (citing *Schall v. Martin*, 467 U.S. 253, 269 (1984)).

The Court would say very little on the Plaintiff's assertion of facial invalidity

regarding S.C. Code § 59-112-20 and S.C. Code of Regs. §§ 62-602(C), 62-603(B). Plaintiff's own theory of liability, which is that this statute and these two regulations operate unconstitutionally *only* against dependent students who happen to be both U.S. citizens and children of undocumented parents, is inconsistent with such an assertion. First, the challenged statute and regulations are silent regarding immigration status and do not invidiously discriminate against any protected class.[8] Second, the statutory and regulatory scheme pertaining to residency determinations must be applied in a very specific manner, including interface with statutes and regulations (e.g. S.C. Code § 59-101-430(B), S.C. Code of Reg. § 62-604(A)) that Plaintiff has not challenged, to even invoke the precise scenario of which Plaintiff complains. It is important to note that dependent students' classification as either a resident or non-resident pursuant to the challenged statute and regulations is based on their parents' *state residency status*, not their parents' immigration status specifically. The parents' immigration status is only incidentally implicated by the fact that it can sometimes function as an impediment or complete bar to the *parents themselves* establishing state residency. The facial validity of the challenged statute and regulations is demonstrated by the fact that a U.S. citizen dependent student whose parents have lawful immigration status, but are residents of a different state, would be subject to the same presumption of non-residency of which Plaintiff complains. There are large swathes of U.S. citizen dependent students for whom the application of the challenged statute and regulations is quite obviously constitutionally valid. The Court need say no more. The facial challenge fails.

Before the Court moves on, however, it is perhaps helpful at this juncture to

---

[8] Plaintiff has not asserted, and the Court is not aware of current authority to support the notion, that college-age dependent students who are both U.S. citizens and children of undocumented parents form a constitutionally protected class.

highlight the fact that the statute and regulations against which Plaintiff has made constitutional challenges *do not actually mention immigration status at all*. The importance of this point is magnified by the degree to which Plaintiff has relied upon a recent decision by Judge K. Michael Moore, of the U.S. District Court for the Southern District of Florida, *Ruiz v. Robinson*, 892 F. Supp. 2d 1321 (S.D. Fla. 2012). (*See* ECF No. 38-1 at 16, 18, 20.) In *Ruiz*, Judge Moore evaluated a similar statutory and regulatory framework challenged for essentially the same reason Ms. Rocha challenges the South Carolina framework, and reasoned that while Florida's statutory definition of "legal resident" was facially neutral regarding federal immigration status (*See* Fla. Stat. § 1009.21(1)(d)), "as applied, [the Florida State Board of Education and Florida Board of Governors']⁹ additional criteria for determining residency for public post-secondary education purposes classifies [p]laintiffs in such a way as to deny [p]laintiffs the same benefits and important opportunities as similarly situated individuals by virtue of their parents' undocumented immigration status." *Ruiz*, 892 F. Supp. 2d at 1333. Applying heightened scrutiny, the court held that the "[d]efendants' regulations violate[d] the Equal Protection Clause to the Fourteenth Amendment of the United States Constitution." *Id.* The Florida regulations provided "additional criteria" for determining residency when an individual or the parents of a dependent were not citizens of the United States, including a requirement that "'[t]he student, and parent if the student [was] a dependent, *must present evidence of legal presence in the United States*.'" *Id.* at 1326 (quoting Fla. Admin. Code r. 72–1.001(5)(a)3) (emphasis added).

This explicit requirement to prove lawful immigration status on the part of a

---

⁹ The *Ruiz* defendants were all Chairs or Members of the Florida State Board of Education or the Florida Board of Governors.

dependent student's parent as a condition precedent to a determination of in-state residency is a critical distinction between the Florida regulations that were struck down in *Ruiz*, and the CHE regulations that this Court now upholds in the case *sub judice*. No such requirement exists within the CHE regulations at issue here.[10] As further explained below, this distinction between the Florida regulations and the CHE regulations also goes some way toward explaining how the conduct of the *Ruiz* defendants was proximately related to the constitutional deprivation at issue in that case, whereas Plaintiff has neither plead nor proven any conduct on the part of the named Defendants that is sufficiently proximate to the residency determinations of which she complains.

The remainder of Plaintiff's claims turn on the question of whether S.C. Code § 59-112-20 and S.C. Code of Regs. §§ 62-602(C), 62-603(B) are unconstitutional as applied to the residency determination in Plaintiff's specific circumstance. Though Plaintiff does not bear as heavy a burden in the as applied context as in the facial challenge context, for the reasons stated below she is nevertheless unable to establish a constitutional violation capable of remedy with her claims pled in their current form.

## II. Failure to Sue the Individuals and Institutions Who Made the Residency Determinations and the Unavailability of the Requested Remedies

Plaintiff claims that S.C. Code of Regs. §§ 62-602(C) and 62-603(B) were applied in a manner so as to unconstitutionally deprive her of residency status for tuition and scholarship purposes. Assuming *arguendo* this were true, Plaintiff would need to sue the individuals, or at least the institutions, who actually applied the regulations in her particular case in order to mount a successful lawsuit under 42 U.S.C. § 1983. She

---

[10] See discussion of the rebuttable presumption, contained in S.C. Code § 59-112-20(D) and S.C. Code of Reg. § 62-603(B), that a dependent students' residency mirrors that of their parent, spouse, or guardian *infra*.

has not done so. Instead, she has sued the individual Commissioners of the CHE alleging that their general administration of the regulatory scheme resulted in a determination of non-residency in her particular case. The law and the facts show otherwise.

In South Carolina, residency determinations are not made by the CHE as a group or any of the individual Commissioners. By statute, residency determinations must be made by each college or university. S.C. Code § 59-112-80 provides:

> Each State Institution shall designate an official to administer the provisions of this chapter. Students making application to pay tuition and fees at in-state rates shall have the burden of proving to the satisfaction of the aforesaid officials of State Institutions that they have fulfilled the requirements of this chapter before they shall be permitted to pay tuition and fees at such rate.

*Id.* One would search in vain for any reference within the statutory and regulatory framework surrounding residency determinations for any involvement by the CHE or the individual Commissioners in particular residency determinations. Rather, residency determinations are made by designated residency officers at particular institutions based on the evidence presented by the student in an attempt to satisfy the burden of proof, which the student bears.

Plaintiff could have sued the unspecified residency officer at USC-Upstate with whom she dealt, USC-Upstate itself, Ms. Peggy Collins at Converse, or Converse College itself, but she did not. The Court will not speculate as to why Plaintiff limited her claims to the individual Commissioners of the CHE. There is simply no evidence that the CHE or the individual Commissioners were involved in Plaintiff's residency determination at either USC-Upstate or Converse. Indeed, the undisputed evidence shows that the one member of the CHE bureaucracy that appears to have had any

connection whatsoever with Plaintiff's residency determination, Mr. Gerrick Hampton, simply asked a series of follow up questions to Ms. Collins' initial inquiry about Ms. Rocha's situation, encouraged Ms. Collins and Converse to consider Ms. Rocha's individualized circumstances, discussed the need for Converse to put Ms. Rocha through an appeal if necessary, and advised that whatever determination Ms. Collins or the appeal committee came up with would be the final residency decision Converse would need to communicate to Ms. Rocha. (*See* CHE Dep. 63:1-64:12, Ex. 6, ECF No. 39-3.) The tangential nature of Mr. Hampton's involvement is further revealed by his follow up email six months later, in which he asks what the residency result was in Plaintiff's case. (CHE Dep. Ex. 6, ECF No. 39-3 at 21.) Mr. Hampton can hardly be said to have been the driving force behind Plaintiff's residency decision if he did not even know the result. The point is somewhat moot in any event because Mr. Hampton is not a named defendant in this lawsuit.

Likewise, to the extent that Plaintiff seeks prospective injunctive relief related to future residency determinations at either USC-Upstate or Converse, the residency officers at those institutions, or perhaps the institutions themselves, would be the correct parties against whom such prospective relief would need to be awarded. Instead, Plaintiff has petitioned the Court to enjoin the individual Commissioners of the CHE. The Court cannot help but see this proposed relief as Plaintiff's request for the Court *to order* the CHE *to order* USC-Upstate and Converse to give Plaintiff her desired residency status. The Court cannot engage in this type of relief by proxy, especially where, as here, the applicable statute places ultimate discretion in the hands of the institution, and the named Defendants assert that when such discretion is properly exercised it could

result in the granting *or* withholding of residency for a dependent student with undocumented parents, contingent upon the other elements of the student's circumstance (e.g. whether the student has a South Carolina driver's license, whether the student and/or parent pays income tax in South Carolina, whether the student attended South Carolina public schools and for how long, etc.).

In arguing that she is entitled to a permanent injunction to remedy ongoing irreparable harms, Plaintiff states:

> Ms. Rocha moves the Court to enjoin Defendants from administering any policy and enforcing any law or regulation that requires dependent U.S. citizen students who can otherwise establish South Carolina residency and the South Carolina residency of their parents to also provide evidence of their parents' federal immigration status and/or legal presence in the United States in order to qualify as residents for tuition and state financial aid purposes. Ms. Rocha further requests that the Court order Defendants to take all necessary steps to instruct college residency officers to cease any such inquiries into the immigration status of parents of dependent students and demand that each college residency officer provide written notice to all dependent U.S. citizen students of the change in the administration of residency determinations. Finally, Ms. Rocha requests that the Court order Defendants to take all necessary steps to make reinstatement into the CERRA Teaching Fellows Program possible for Ms. Rocha.

(ECF No. 38-1 at 26.) Would that the Court wielded such unfettered power. Fortunately for the electorate and the integrity of our democratic republic, the Court cannot act as king and compel various state actors to conduct their respective business in a manner that the Court might see as most prudent and equitable. The Court will decline Plaintiff's encouragement to do so.

A plaintiff seeking a permanent injunction must show that (1) it has suffered irreparable injury; (2) the available legal remedies are inadequate to compensate for that injury; (3) the balance of hardships between the plaintiff and defendant warrants an

equitable remedy; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006). But a prerequisite to the issuance of a permanent injunction is jurisdiction over the entity with respect to which such an injunction would cure the alleged harm. Thus, the Court need not reach the merits of Plaintiff's constitutional claims to find that it cannot issue the requested injunctive relief, because the residency officers and/or institutions that actually determined Plaintiff's residency status are necessary, perhaps even indispensable, parties to such a dispute. *See United Shoe Mach. Corp. v. United States*, 258 U.S. 451, 456 (1922) (defining indispensable parties as those entities whose relation to the suit is such that "no decree can be entered in the case which will do justice to the parties before the court without injuriously affecting the rights of absent parties"); *James v. Almond*, 170 F. Supp. 331, 341 (E.D. Va. 1959) (holding that a city school board was a necessary party to a proceeding to enjoin enforcement of Virginia's "massive resistance" laws).

In sum, the residency determinations that resulted in the denial to Plaintiff of in-state tuition and the LIFE Scholarship, and which Plaintiff claims violated her constitutional rights, were made at the institutional level. But instead of suing the institutions or individuals who made those decisions, and thus the entities that applied the residency regulations in a putatively unconstitutional manner, Plaintiff has sued the CHE Commissioners who have no demonstrable enforcement authority over particular residency determinations generally and certainly no demonstrable involvement in the residency determinations at issue in this case.

Plaintiff's failure to sue to the proper parties is not a minute technical failure that

the Court is at liberty to overlook. Personal participation of a defendant is a necessary element of a § 1983 claim against a government official in his or her individual capacity. *See Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001) (applying this principle in the context of a *Bivens* action and stating "liability is personal, based upon each defendant's own constitutional violations"). In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the U.S. Supreme Court held that a government body cannot be held liable under § 1983 on a *respondeat superior* theory for the unconstitutional actions of one of its employees. *Id.* at 694. Moreover, "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Mere knowledge of a subordinate's unconstitutional actions is not sufficient to establish personal participation, and "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id.* at 677.

Plaintiff has not satisfied this fundamental tenet of a § 1983 claim. She has not alleged or proven any personal participation by any of the named Defendants in the residency determinations made at either USC-Upstate or Converse. In depositions, Ms. Donette Stewart of USC-Upstate and Mr. Trevor Pittman of Converse, admissions personnel at each institution respectively, both confirmed that they had no contact with any of the Commissioners and were not aware of any action or involvement by the Commissioners in the residency determinations for the Plaintiff. (*See* USC-Upstate Dep. 234:8-235:17, ECF No. 40-4; Converse Dep. 232:12-232:17, ECF No. 40-5.) Similarly, Plaintiff testified that neither she nor anyone on her behalf had any contact with the

Commissioners relative to the residency determinations or for any purpose. (*See* Rocha Dep. 83:-84:14, ECF No. 40-2.) Plaintiff's complaint also contains no reference to personal participation by any of the Commissioners in the challenged residency decisions and alleges only broad concepts such as Defendants' purported "policy and practice" of classifying U.S. citizen dependent students as non-residents based solely on their parents' immigration status, and Defendants' "promulgat[ion] of a rule" that allegedly produced such results. (*See* ECF No. 1 at 1-2, 9-10.)

To put it simply, beyond the fact that the named Defendants are members of the regulatory body that is responsible for the challenged regulations, Plaintiff has not shown any proximate relationship between the individuals she sued and the wrongs she alleges. But, "In order to prevail on a constitutional claim for damages under § 1983, a plaintiff must show that the defendants were the proximate cause of [her] injuries." *Green v. Padula*, 2007 WL 2493563, *4 (D.S.C. 2007) (citing *Martinez v. California*, 444 U.S. 277, 285 (1980)). The Fourth Circuit has explained that "the causal link in § 1983 cases is analogous to proximate cause." *Shaw v. Stroud*, 13 F.3d 791, 800 (4th Cir. 1994). *See also*, *Blue v. Bigos*, 89 F.3d 827 (4th Cir. 1996) ("proximate cause is part of a § 1983 plaintiff's burden"); *Plummer v. Goodwin*, 2010 WL 419927, *7 (D.S.C. 2010) (actions of government official must have proximately caused the § 1983 plaintiff's injuries).

Moreover, the vulnerability of Plaintiff's complaint and theory of the case in this regard is revealed by Plaintiff's repeated conflation, throughout her filings, of the individual Defendants and the Commission itself as a regulatory body. (*See, e.g.*, ECF No. 38-1 *passim.*) She regularly refers to "the Commission" as taking certain actions,

authorizing certain residency results, or playing certain roles in residency decisions with no factual or legal justification for such assertions. (*See, e.g., id.* at 15 (attributing to "the Commission" actions and communications actually undertaken by Mr. Hampton).) The Commission as a regulatory body is not a party, and given its quasi-legislative function would be afforded immunity under the Eleventh Amendment to the U.S. Constitution in any event. *See Supreme Court of Virginia v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 731-34 (1980). Likewise, the individual members of the Commission are immune from suit when acting in their quasi-legislative capacity. *See id.* at 734. The Commission itself is also not a "person" within the meaning of 42 U.S.C. § 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70-71 (1989) (holding that a suit against the state police department was a suit against the state and "neither a State nor its officials acting in their official capacities are 'persons' under § 1983"). To the extent that Defendants are being sued for any actions taken in their official capacities, they also are not "persons" within the meaning of § 1983. *See id.* "Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. *Id.* (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). "As such, it is no different from a suit against the State itself." *Id.* (citing *Kentucky v. Graham*, 473 U.S. 159, 165-166 (1985); *Monell*, 436 U.S. at 690, n.55).

Although Plaintiff disclaims the following assessment, a candid evaluation of her complaint reveals that she has sued the CHE Commissioners for exercising their quasi-legislative authority to promulgate regulations with respect to residency determinations. Defendants have correspondingly asserted legislative immunity. (ECF No. 40-1 at 23-25

(citing *Bogan v. Scott-Harris*, 523 U.S. 44 (1998) (holding that state and local legislators are entitled to absolute immunity from suit for their legislative acts); *Supreme Court of Virginia*, 446 U.S. at 734 (holding that the members of the Virginia Supreme Court were entitled to absolute legislative immunity in connection the quasi-legislative function of promulgating the State Bar Code); *Bruce v. Riddle*, 631 F.2d 272, 280 (4th Cir. 1980) (holding that county council members were entitled to absolute immunity when performing legislative acts, and that they were acting within the scope of that legislative activity when they voted on controverted ordinances despite their previous meetings with partisans to one side of the zoning controversy); *Health Promotion Specialists v. South Carolina Board of Dentistry*, 743 S.E.2d 808, 815 (2013) (holding that the promulgation of emergency regulations by the South Carolina Board of Dentistry constituted a legislative or quasi-legislative act that was entitled to absolute legislative immunity under both the Tort Claims Act and common law)).) The Court would have little trouble in concluding that any of the acts Plaintiff has alleged which are actually attributable to the Commissioners themselves are legislative in nature, and therefore subject to absolute immunity under the corresponding precedent. This is due to the fact that the Court has not been made aware of any acts that are attributable to the Commissioners *except* the promulgation of the challenged regulations. But the Court need not even get to that point in the inquiry because of how Plaintiff has limited her own constitutional challenge.

After acknowledging the doctrine of legislative immunity, Plaintiff insists that she is not challenging the enactment of the regulations, but rather "Defendants' unconstitutional administration, oversight, and enforcement of those regulations," and

Defendants' "policy and practice" of classifying dependent students as non-residents on an unconstitutional basis. (ECF No. 43 at 28.) These conclusory allegations, without further evidentiary support, are insufficient to withstand summary judgment. *See Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). Other than introducing the parties in her complaint, Plaintiff never addresses any of the Defendants by name. She never points to any evidence suggesting that any Defendant took individual action. Plaintiff never asserts, let alone proves, that any of the Defendants were aware of the Plaintiff, made the residency determinations in her case, were consulted by the residency officials at USC-Upstate or Converse, or were even aware of the issue of statutory construction that is now the focus of this lawsuit (namely the rebuttable presumption of mirrored residency in the case of dependent students with undocumented parents) prior to the filing of this lawsuit. It is not enough for Plaintiff to simply state that the Commissioners are sued for their administrative and enforcement functions, yet fail to provide *any* evidence that *any* Defendant engaged in such functions in a manner proximately connected to her case. She cannot successfully sue the Commissioners under § 1983 merely for being part of the CHE while other individuals, not party to this litigation, were making putatively unconstitutional decisions without the Commissioners' knowledge or direction.

Plaintiff has asserted that summary judgment is not appropriate because there are outstanding disputes of fact as to why USC-Upstate classified Ms. Rocha as a non-resident for tuition and scholarship purposes. (ECF No. 43 at 7.) Specifically, Defendants argue that Plaintiff was denied residency at USC-Upstate because she submitted a Georgia driver's license for her father during the residency determination

process, and that an out-of-state license is deemed to be compelling evidence of residency somewhere other than South Carolina, irrespective of the individual's immigration status. (ECF No. 40 at 2.) Plaintiff, of course, argues that she was denied residency based solely on her father's status as an undocumented immigrant. (ECF No. 38-1 at 15.) There is indeed a factual dispute on this point, but it is not material because proof of one or the other party's position would not affect the outcome under the law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Whether the denial of residency was based on the submission of an out-of-state driver's license or on Ms. Rocha's father's immigration status, the fact remains that it was the residency officer at USC-Upstate and none of the named Defendants that effectuated the denial.

Plaintiff further asserts that summary judgment should not be granted because there are factual disputes about the "role Defendants play in residency decisions." (ECF No. 43 at 7.) But the Plaintiff simply has not submitted any evidence that the Defendants actually played a role in her residency determinations. Thus, this purported factual dispute, even if material, is not genuine because no reasonable jury could find in favor of Plaintiff on the evidence offered. *Anderson*, 477 U.S. at 257.

Finally, Plaintiff claims that there are outstanding factual disputes regarding whether or not the presumption that a dependent student's residency is the same as their parent, spouse, or guardian is rebuttable. (ECF No. 43 at 7.) The Court disagrees that this is a factual dispute, finding rather that it presents a legal question for the Court as interpreter of laws and regulations. *See City of Arlington, Tex. v. F.C.C.*, 133 S.Ct. 1863, 1868 (2013) (stating that when a statute is silent or ambiguous with respect to a specific issue, "the question for the court is whether the agency's answer is based on a

permissible construction of the statute" (quoting *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 838 (1984))). Moreover, to the extent Plaintiff argues that this question incorporates a factual element because "the Commission" has a policy or practice of denying residency in situations like her own, the Court would again point to the lack of evidentiary basis for the Commissioners' involvement in *any* residency determinations, let alone the Plaintiff's.

In summary, Plaintiff essentially asks the Court to hold the CHE Commissioners liable for the conduct of one of their subordinates (Mr. Hampton) and for the conduct of the residency officers at USC-Upstate and Converse, rather than their own individual actions. This litigation posture runs afoul of the basic tenets of § 1983 jurisprudence. In Plaintiff has failed to plead and prove a necessary element of her § 1983 claim against Defendants, and for that reason, the Defendants are entitled to summary judgment.

### III. The Rebuttable Presumption of Mirrored Residency for Dependent Students with Undocumented Parents

In truth, the Court could end the analysis of the parties' cross-motions for summary judgment with the explanation of Plaintiff's failure to sue the proper parties provided above. In an abundance of caution, the Court will also provide an analysis of the operation of the challenged regulations as it relates to Plaintiff's Equal Protection, Substantive Due Process, and Privileges and Immunities theories.

As already mentioned, under the statutory and regulatory scheme at issue, the burden of proving residency for in-state tuition and fee purposes, and by extension state scholarships, is always on the student applicant. S.C. Code § 59-112-80; *see* S.C. Code of Reg. §§ 62-600(B), 62-605(B), 62-606(A), 62-610(B), 62-1200.5(NN). Independent persons who cannot establish that they are lawfully present in the United States are

barred, on the basis of lack of residence, from eligibility for in-state rates and scholarships. S.C. Code § 59-101-430(B); S.C. Code of Reg. §§ 62-602(K), 62-604(A). S.C. Code § 59-112-20(D) states that the residence and domicile of a dependent minor is *presumed* to be that of the dependent minor's parent. S.C. Code of Reg. § 62-603(B) states that the residence and domicile of a dependent person is *presumed* to be that of their parent, spouse, or guardian. Taking all of the relevant statutory and regulatory provisions together, all dependent students are *presumed* to be non-residents if they are dependent on persons with unlawful immigration status. Importantly though, dependent students are subject to the same presumption of non-residency if the person on whom they are dependent is unable to establish South Carolina residency for reasons other than being undocumented (e.g. a dependent student's parent maintains residence and domicile in another state). Thus, the statutory and regulatory framework for determining residency does not place any special burden on dependent students with undocumented parents.

One of the most basic cannons of statutory interpretation is that "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. U.S.*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (internal quotation marks and alterations omitted). Yet Plaintiff's reading of the phrase "presumed to be" in S.C. Code § 59-112-20(D) and S.C. Code of Reg. § 62-603(B) to mean "equals," would render the phrase superfluous. In other words, under the cannon against superfluity, the Court should assume that the South Carolina General Assembly and the CHE intentionally used the phrase "presumed to be," rather than leaving it out altogether and establishing

an automatic and absolute superimposition of a parent's residency status upon their dependent student.[11] The alternative to an automatic and absolute mirroring of residency from parent to student is a mirroring that operates generally, but can be shown to be inapposite in certain circumstances, namely: a *rebuttable* presumption.

It can often be a delicate exercise to balance respect for an agency's knowledge, expertise, and legislatively vested office with the courts' role as interpreter of the law; however, in situations where such balancing is required familiar principles guide the inquiry. *See Gonzales*, 546 U.S. at 255. An administrative rule may receive substantial deference if it interprets the issuing agency's own ambiguous regulation. *Auer v. Robbins*, 519 U.S. 452, 461-463 (1997). An agency's interpretation of an ambiguous statute may also receive substantial deference. *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-845 (1984). However, *Chevron* deference is warranted only "when it appears that [the legislature] delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226-227 (2001). Otherwise, the interpretation is "entitled to respect" only to the extent it has the "power to persuade." *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

Defendants have asserted from the outset of this case that the provisions in question create a *rebuttable* presumption of mirrored residency, and the Court agrees. During the pendency of this litigation, the Commission issued guidance to South Carolina colleges and universities explicitly stating that the presumption is rebuttable,

---

[11] If the "presumed to be" language had been left out, the last sentence of § 62-603(B) would read: "Thus, the residence and domicile of a dependent person shall be that of their parent, spouse, or guardian."

explaining how dependent students can achieve this rebuttal, and directing that a U.S. citizen student who can establish domicile in South Carolina should not be denied in-state residency status on the basis of his or her parent's undocumented status. (Carullo Decl. Ex. A, ECF No. 51-2.) The CHE is likely entitled to *Chevron* deference for its interpretation of its own ambiguous regulation, and the accompanying statute, because the South Carolina General Assembly delegated authority to the CHE to make rules carrying the force of law, and § 62-603(B) was promulgated in the exercise of that authority. *See Mead*, 533 U.S. at 226-227. However, even if the CHE's interpretation of § 62-603(B) is entitled to persuasive effect only, the Court would still agree that the presumption of mirrored residency is rebuttable. It is important that the clarification provided in the October 1, 2015 guidance document (EFF No. 51-2) was able to be achieved without changing the wording of § 59-112-20(D) or § 62-603(B), and effectively remedied the prospective harm that Plaintiff forecasted in her requests for injunctive relief. Put simply, the improper classification of which Plaintiff originally complained will no longer result so long as residency officers at South Carolina post-secondary institutions follow the guidance that now accompanies the regulations. The gap in the residency adjudication scheme has been filled.

While the Court continues to believe that the question of whether the presumption in § 59-112-20(D) and § 62-603(B) is rebuttable is a *question of law* within the Court's authority and responsibility to decide as interpreter of the law, the factual record also supports the notion that the presumption was and is rebuttable. When Ms. Collins approached Mr. Hampton on behalf of Converse seeking advice regarding the residency determination in Plaintiff's case, she asked: "Dependent student is a US

Citizen but her parents are not citizens nor are they permanent residents. Is the student eligible for state scholarships?" (CHE Dep. Ex. 6, ECF No. 39-3 at 23.) If the presumption of mirrored residency was not rebuttable Mr. Hampton surely could have simply responded that the dependent student (Ms. Rocha) was not eligible. Instead, Mr. Hampton responded by asking:

1) How long has the student been in SC? Were they born here?
2) Did the family file taxes? Did the student?
3) Does the student have a SC DL? Did they do a FAFSA? If so, whose information did they use?
4) Do you have some type of appeal process for residency or State scholarships?
5) Is this student receiving a SC Tuition Grant?

(*Id.* at 22.)

These questions are clearly designed to gather the type of information that might ultimately weigh toward rebutting the presumption that Ms. Rocha's residency mirrored that of her parents, who were described as non-citizens and non-residents. Ultimately, Mr. Hampton had a phone conversation with Ms. Collins about Plaintiff's circumstance, in which he encouraged Ms. Collins to utilize Converse's residency appeal process to weigh all of the relevant factual inputs in arriving at a final determination. (CHE Dep. 63:1-64:12, ECF No. 39-3.) None of that advice makes sense unless the presumption of mirrored residency was rebuttable.[12]

---

[12] The Plaintiff encourages the Court to consider other email inquiries made to Mr. Hampton regarding residency determination advice for dependent students similarly situated to Ms. Rocha at various South Carolina post-secondary institutions. (ECF No. 38-1 at 12-13; *see* CHE Dep. Exs. 7, 8, 9, ECF No. 39-3.) She claims that in these individual cases, "Defendants have authorized the classification of each dependent U.S. citizen as non-residents of South Carolina solely on the basis of a parent, guardian, or spouse's immigration status, in accordance with CHE regulations." (ECF No. 38-1 at 13.) Putting aside this glaring error of attribution (none of the Defendants were party to Mr. Hampton's communications with the residency officers at the various institutions), the Court finds that the preponderance of Mr. Hampton's email responses support the notion that the presumption of mirrored residency was considered rebuttable. In addition, the Plaintiff filed a motion to supplement the record (ECF No. 55), which the Court granted by way of text order (ECF No. 61), introducing two newly discovered email chains between Mr. Hampton and residency officers at USC-Lancaster and USC-Columbia, dated July 2012 and April 2013

The factual record also includes a chain of correspondence dated in April and May 2013, contemporaneous with the approximate time period that Ms. Rocha was interacting with USC-Upstate officials about her residency determination, which demonstrates that a dependent student in precisely the same situation as Ms. Rocha successfully rebutted the presumption of mirrored residency initially assigned to him by USC-Columbia. (Woodfaulk Aff. Ex. A, ECF No. 44-2 at 2-5.) The residency appeals committee at USC-Columbia determined that the presumption in § 62-603(B) was overcome, that the dependent student in question was both a resident and domiciliary of South Carolina despite the undocumented status of the student's parents, and that the student was correspondingly entitled to in-state tuition. (*Id.* at 4.) Additionally, in a letter related to that case dated May 23, 2013, Julie Carullo, then Deputy Director and Director of Governmental Affairs at the CHE, reiterated to the student's legal counsel that South Carolina institutions, not the CHE, make residency determinations, and that because USC-Columbia determined the student was eligible for in-state tuition he may be eligible for state scholarships and merit awards as well. (*Id.* at 5.) This evidence cuts directly against the Plaintiff's assertion that the CHE had an established *policy* of

---

respectively. (ECF Nos. 55-6, 55-8.) The Court grants that Mr. Hampton's statements in these earlier emails appear to indicate that "there is no relief" for the dependent children of undocumented immigrants, *i.e.* that the presumption of mirrored residency *cannot* be rebutted. (*See id.*) However, the tenor of his advice in this regard changed long prior to the filing of this lawsuit in June 2014. (*See* CHE Dep. Ex. 7, ECF No. 39-3 at 24 (dated in August 2013, recommending that the institution review the case of a similarly situated dependent student "as a whole" and stating that if the institution considered a finding of in-state residency warranted, such a finding would not be considered out of compliance with the regulations).) The Court has considered these newly discovered emails and given them the weight they deserve, keeping in mind that Mr. Hampton was not given an opportunity to explain the evolution of his answers on this point in his deposition, nor were Defendants afforded an opportunity to submit counter-affidavits as the Court did not deem them necessary. The crux of this issue is inescapable: Mr. Hampton is not a named defendant in this lawsuit, and did not act on behalf of, in conjunction with, or at the direction of any named defendant. Neither does he, as an individual employee of the CHE, set the controlling interpretation of CHE residency regulations, notwithstanding the fact that he appears to be the go-to person when institutional residency officers have questions. The Court's position on the presumption of mirrored residency in § 59-112-20(D) and § 62-603(B) remains unchanged: it was and is a *rebuttable* presumption.

denying dependent students residency based on their parents unlawful immigration status alone.

In *Vlandis v. Kline*, 412 U.S. 441 (1973), the U.S. Supreme Court held that a "permanent and irrebutable presumption of nonresidence" for the purpose of in-state tuition and fees violated the Due Process Clause of the Fourteenth Amendment. *Id.* at 453. The Supreme Court reasoned that such an irrebutable presumption was an unconstitutional means for the State of Connecticut to preserve and protect for its own residents access to its colleges and universities and the right to attend such institutions on a preferential tuition basis "because it provid[ed] no opportunity for students who applied from out of State to demonstrate that they have become bona fide Connecticut residents." The "irrebutable presumption" doctrine, established in a line of cases of which *Vlandis* was part, was largely abandoned soon thereafter, *see Weinberger v. Salfi*, 422 U.S. 749, 772 (1975), because:

> The doctrine forced the government to grant hearings to persons who claimed to have been wrongly trapped inside overinclusive classifications; the idea was that even if a person clearly fell within a legislative class, due process required that he be given the opportunity to show that he "really" (that is, according to the "true" purpose or justification for the distinction) belonged on the other side of the legislative line.

*Brennan v. Stewart*, 834 F.2d 1248, 1258 (5th Cir. 1988). But the reasoning behind why such irrebuttable presumptions were found unconstitutional in the first place is a helpful foil to understanding why rebuttable presumptions are permissible. The *Vlandis* court stated: "It is forbidden by the Due Process Clause to deny an individual the resident rates on the basis of a permanent and irrebuttable presumption of nonresidence, when that presumption is not necessarily or universally true, in fact, and when the State has reasonable alternative means of making the crucial determination." *Vlandis*, 412 U.S. at

452. To put it in colloquial terms, where it is possible as a factual matter for an individual excluded from a particular group to prove that they actually belong within that group (in this case individuals with in-state residency status), and the State has reasonable means of evaluating the relevant facts, the individual ought to be given an opportunity to submit those facts for consideration, rather than being categorically and permanently excluded.

In *Lavine v. Milne*, 424 U.S. 577 (1976), the U.S. Supreme Court held that the use of a rebuttable presumption in the context of eligibility for benefits does not impermissibly shift the burden of proof where the applicant carries the burden from the outset. *Id.* at 584. Rather, it simply involves the "normal assumption that an applicant is not entitled to benefits until [she] proves [her] eligibility." *Id.* Moreover, the use of a rebuttable presumption specifically in the context of higher education residency determinations has been held to be constitutionally permissible. *Hooban v. Boling*, 503 F.2d 648, 650 (6th Cir. 1982) ("We hold that the one year residency requirement and the rebuttable presumption of out-of-state status do not violate the Equal Protection Clause"); *see also Vlandis v. Kline*, 412 U.S. 441, 451-52 (1973) (contrasting the unconstitutional permanent and irrebuttable presumption of nonresidence with the application of valid, reasonable criteria for evaluating an applicant's bona fides of residence for purposes of tuition and fees).

### A. Equal Protection Claim

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall deny "any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. Thus, the Equal Protection

Clause embodies the fundamental principle that "all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 217 (1982) (quoting *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920)). Moreover, the Constitution forbids arbitrary differentiations among groups of persons who are similar in all aspects relevant to attaining the legitimate objectives of legislation. *See F.S. Royster*, 253 U.S. at 415. At the same time, "The equality at which the [Equal Protection Clause] aims is not a disembodied equality. . . . The Constitution does not require things which are different in fact or opinion to be treated in law as though they were the same." *Tigner v. Texas*, 310 U.S. 141, 147 (1940).

Legislative classifications that do not peculiarly disadvantage a protected class and do not interfere with a fundamental right are often afforded a low level of scrutiny, and those which bear a rational relationship to a legitimate state purpose are generally upheld. *Mass. Bd. of Retirement v. Murgia*, 427 U.S. 307, 313-314 (1976); *see Plyler*, 457 U.S. at 216 ("In applying the Equal Protection Clause to most forms of state action, we thus seek only the assurance that the classification at issue bears some fair relationship to a legitimate public purpose."). However, legislative classifications that call for a higher level of scrutiny, only pass constitutional muster when they are "substantially related" to the achievement of "important governmental objectives." *Craig v. Boren*, 429 U.S. 190, 197 (1976); *see Plyler*, 457 U.S. at 216 ("[W]e have recognized that certain forms of legislative classification, while not facially invidious, nonetheless give rise to recurring constitutional difficulties; in these limited circumstances we . . . inquir[e] whether [the classification] may fairly be viewed as furthering a substantial interest of the State.").

In *Plyler*, the U.S. Supreme Court held that a Texas statute which operated to withhold from local school districts state funds for the education of children who were not "legally admitted" into the United States, and which authorized local school districts to deny enrollment to such children, violated the Equal Protection Clause of the Fourteenth Amendment because it did not further a substantial state interest. 457 U.S. at 229. However, *Plyler* is easily distinguishable from the instant case on a number of grounds. The most relevant distinguishing factor to the current analysis is that the state statute challenged in *Plyler* explicitly classified school-age children as eligible or ineligible for state education funds and enrollment in public schools based on their immigration status. *See Plyler*, 457 U.S. at 205 n.1 (quoting the text of Tex. Educ. Code. § 21.031 (Vernon Supp. 1981), which was struck down).[13] In contrast, the statute and regulations challenged in this case are silent regarding immigration status, and merely establish a default rule for determining the residency of dependent students. *See* S.C. Code § 59-112-20(D); S.C. Code of Reg. §§ 62-602(C), 62-603(B). They classify dependent students based on the state residency of their parents, not specifically on their parents' immigration status as Plaintiff avers. *See id.*

The Court is not naïve to the reality that this default classification gets muddied when the parents happen to be undocumented. But this is merely an idiosyncrasy of combining the challenged provisions (§ 59-112-20(D), §§ 62-602(C), 62-603(B)) with the fact that independent undocumented individuals are categorically precluded, *on the basis of residence and lack of ability to establish domicile*, from eligibility for in-state

---

[13] The reader will also note that the Mexican school-age children who successfully sought declaratory and injunctive relief in *Plyler* sued the local superintendent, the local school district, and the local board of trustees in Tyler, Texas, where they had actually been excluded from the public school, not the Texas legislature that enacts the Texas Education Code, nor the Texas Education Agency that administers those laws and promulgates accompanying regulations.

rates and state scholarships. *See* S.C. Code 59-101-430(B); S.C. Code of Reg. §§ 62-602(K), 62-604(A). The conundrum created by the combined effect of all these provisions became moot for purposes of prospective relief when the CHE issued its guidance document specifying that the presumption of mirrored residency is *rebuttable* in this particular scenario, and that no U.S. citizen student who can otherwise establish domicile is to be denied in-state residency on the basis of his or her parent's undocumented status. (Carullo Decl. Ex. A, ECF No. 51-2 at 3.) Even without the guidance though, as already explained, the cannon against superfluity indicates that the presumption was and is *rebuttable*, which leads to the common sense conclusion that those dependent students for whom the presumption proves inaccurate can avail themselves of the appeals procedure at the institution that denied them residency. *See* S.C. Code of Reg. § 62-612(B).

There is no Fourth Circuit precedent that delineates what level of scrutiny is proper in this particular context. The Court believes that rational basis review is the appropriate standard to be applied to the statutory and regulatory classification at issue. Section 59-112-20(D) of the South Carolina Code, and sections 62-602(C) and 62-603(B) of the Code of Regulations classify dependent students on the basis of their parent, spouse, or guardian's state residency status. To the extent the initial classification does not match the dependent student's bona fide residence and domicile, the classification can be rebutted by submission of evidence substantiating such bona fides. The rebuttable presumption created by the South Carolina residency scheme is designed to prevent students who are dependent on non-residents from enjoying the benefits of in-state tuition and state scholarships. Said differently, the rebuttable

presumption serves to prevent out-of-state students, not truly independent, from establishing residency in South Carolina solely for the purpose of receiving lower tuition rates and scholarship monies, despite no legitimate connection to the state. In *Vlandis*, the Supreme Court did not discuss the level of constitutional scrutiny being applied but nonetheless acknowledged that "a State has a legitimate interest in protecting and preserving the quality of its colleges and universities and the right of its own bona fide residents to attend such institutions on a preferential tuition basis." 412 U.S. at 453. The Court finds that the classification at issue here is rationally related to a legitimate governmental interest, and thus does not violate the Equal Protection Clause.

Plaintiff points to *Ruiz v. Robinson*, 892 F. Supp. 2d 1321 (S.D. Fla. 2012) as an analogous case, and argues that the result there counsels toward invalidating the provisions challenged here on equal protection grounds. (*See* ECF No. 38-1 at 16, 18, 20.) As partially explained above, while the statutory and regulatory scheme at issue in *Ruiz* is similar to the statutory and regulatory framework here, a close reading reveals that it is different in constitutionally determinative ways.

In *Ruiz*, Fla. Stat. § 1009.21(2)(a) dictated that in order to establish residency for tuition purposes, "[a] person or, if that person is a dependent child, his or her parent or parents *must* have established legal residence in this state and *must* have maintained legal residence in this state for at least 12 consecutive months immediately prior to his or her initial enrollment in an institution of higher education." *Ruiz*, 892 F. Supp. 2d at 1325-26 (emphasis added). The Florida State Board of Education and Board of Governors had adopted additional criteria in determining residency for tuition purposes, including criteria to be applied when an individual or the parents of a dependent were

not U.S. citizens. *Id.* at 1326. The *Ruiz* court honed in on the following criteria in finding that § 1009.21(2)(a) violated the Equal Protection Clause as applied: "'[t]he student, and parent if the student is a dependent, *must present evidence of legal presence* in the United States.'" *Id.* at 1326, 1333 (emphasis added) (quoting Fla. Admin. Code r. 72-1.001(5)(a)3; citing Fla. Admin. Code r. 6A–10.044(4)). There was no mention of a "presumption" in the Florida statute or regulations. A fair reading of the texts indicates that together they established a de facto, *irrebutable* assignment of the parent's residency to the dependent student. And because that assignment was irrebutable, a student who was dependent on an undocumented parent *could not* establish Florida residency for purposes of in-state tuition, notwithstanding the student's own U.S. citizenship and bona fides of residency.

Thus, the *Ruiz* court stated, "the State regulations deny a benefit to [p]laintiffs and impinge [p]laintiffs' ability to attain post-secondary education at the State's public institutions solely by virtue of their parents' undocumented status, and in a very real way the regulations punish the citizen children for the acts of their parents." 892 F. Supp. 2d at 1330. Moreover, the *Ruiz* court found that the regulations, "classify U.S. citizens as aliens, and in so doing, create a second-tier of U.S. citizenship that depreciates the historic values of *[p]laintiffs'* citizenship by affording [p]laintiffs some of the benefits that other similarly situated U.S. citizens enjoy but not all of the benefits." *Id.* at 1331. For these reasons, the court applied heightened scrutiny, holding, "the State regulations' classification is subject to heightened scrutiny and will not run afoul of the Equal Protection Clause so long as it is 'substantially related' to 'important governmental objectives.'" *Id.* Applying that standard, the *Ruiz* court found that the classification at

issue bore no substantial relationship to the governmental objectives that it considered, including (1) preservation of the state's limited financial means and the quality of public post-secondary education, (2) the state's interest in distributing tax funds back to its own citizens from whom a significant portion of the funds originate, and (3) the state's interest in ensuring that in-state tuition benefits are provided only to those who evince an intent to remain in Florida post-graduation, thus contributing to the state economy by virtue of their post-secondary degree. *Id.* at 1331-33.

The *rebuttable* presumption at issue in this case simply does not present the same equal protection problems as the statutory and regulatory scheme at issue in *Ruiz*. There, the residency scheme assigned the parent's residency status, and with it the consequences of the parent's alienage, to the dependent student in an irrebuttable fashion. Here, the residency presumption establishes a default rule that accurately captures the residency status of the vast majority of dependent students as a matter of course. Where the default rule does not accurately reflect a dependent student's residence, a scenario that is possible both for students with undocumented parents and for students whose parents' have lawful immigration status, the residency scheme permits the student to substantiate their residency bona fides by providing relevant evidence. In light of the differences between the two cases, the Court does not see the ruling it issues herein as being at odds with the ruling in *Ruiz*. Again, the CHE guidance document clarified any ambiguity that might have led to past and future improper residency classifications under § 59-112-20(D) and § 62-603(B). Accordingly, the Court grants Defendants' motion for summary judgment on the Equal Protection Clause claim.

### B. Substantive Due Process Claim

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no State shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. Although explicitly about procedure, the Due Process Clause has been held to incorporate a substantive component, and statutes have been held unconstitutional where they infringe the Due Process Clause because they "violate basic values 'implicit in the concept of ordered liberty.'" *Griswold v. Connecticut*, 381 U.S. 479, 500 (1965) (quoting *Palko v. State of Connecticut*, 302 U.S. 319, 325 (1937). In count two of the complaint, the Plaintiff alleges that "South Carolina residency regulations infringe on Plaintiff's liberty interest to reside with her parents" (ECF No. 1 at ¶ 44), and "Defendants' policy and practice of classifying as a non-resident a United States citizen student because she resides in South Carolina with her parents who lack documented immigration status, penalizes Plaintiff and infringes on her fundamental right to familial association in violation of the Fourteenth Amendment to the United States Constitution" (*Id.* at ¶ 45).

"[C]ourts should exercise 'judicial self-restraint' and 'utmost care' in novel substantive due process cases." *Waybright v. Frederick County*, 528 F.3d 199, 204 (4th Cir. 2008) (citing *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 125 (1992)). The Fourth Circuit Court of Appeals has explained:

> [C]ourts must be reluctant to expand the concept of substantive due process because the guideposts for responsible decision-making in this uncharted area are scarce and open-ended, which means that the courts must exercise the utmost care whenever we are asked to break new ground in this field lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of judges.

*Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999) (en banc) (internal quotation

marks, modifications, and citations omitted). The Court is unaware of any authority that recognizes a constitutionally protected liberty interest on the part of a child that has reached majority to live with his or her parents. The Court declines Plaintiff's invitation to embed such a right within the protections of the Due Process Clause.

The Fourth Circuit Court of Appeals has held that, "the sanctity of the family unit is a fundamental precept firmly ensconced in the Constitution and shielded by the Due Process Clause of the Fourteenth Amendment." *Hodge v. Jones*, 31 F.3d 157, 163 (4th Cir. 1994) (citing *Jordan by Jordan v. Jackson*, 15 F.3d 333, 343 (4th Cir. 1994) ("The bonds between parent and child are, in a word, sacrosanct, and the relationship between parent and child inviolable except for the most compelling reasons.") However, "The concept of familial privacy has been restricted by the Supreme Court to (1) thwarting governmental attempts to interfere with particularly intimate family decisions, and (2) voiding government actions that sever, alter, or otherwise affect the parent/child relationship." *Id.* Moroever:

> Following that lead, circuit courts have strictly construed actionable violations of the familial privacy right to encompass only those instances where state officials' actions were directly aimed at the parent-child relationship, *Pittsley v. Warish*, 927 F.2d 3, 8 (1st Cir.), cert. denied, 502 U.S. 879 (1991), implicated the "most essential and basic aspect of familial privacy—the right of the family to remain together without the coercive interference of the awesome power of the state," *Duchesne v. Sugarman*, 566 F.2d 817, 825 (2d Cir. 1977), "drove a wedge into [a] family and threatened its very foundation," or "eroded the family's solidarity internally and impaired the family's ability to function," *Bohn v. Dakota County*, 772 F.2d 1433, 1436 n. 4 (8th Cir. 1985).

*Id.* Suffice to say, there is no colorable claim that Plaintiff's residency determinations or the underlying regulations even remotely approach the level of interference with familial privacy that would make Plaintiff's claims viable under a substantive due process

theory.

In *Shaw v. Stroud*, 13 F.3d 791 (4th Cir. 1994), the Fourth Circuit declined to recognize a substantive due process claim for loss of the love and support of a family member. *Id.* at 805. The *Shaw* court stated, "the United States Supreme Court has never held that the protections of substantive due process extend to claims based on governmental action which affects the family relationship only incidentally." *Id.* Plaintiff's claims regarding the residency determinations, even if true, cannot be said to impact her family relationships in any more than an incidental fashion. As such, they are not cognizable under a substantive due process theory.

Plaintiff argues that even if the presumption that a dependent student's residency mirrors that of their undocumented parents is rebuttable, it still impermissibly burdens her familial right of association because the actions she would need to take in order to rebut the presumption interfere with her right to live with her parents and purportedly require her to disassociate from her parents and their support. (ECF No. 38-1 at 24; ECF No. 43 at 18-19.) This argument is a straw man. It assumes without justification that in order to rebut the presumption a dependent student would need to become an independent person under the applicable regulations. Rather, as clearly elucidated in the CHE guidance document, a dependent student with undocumented parents may be granted in-state residency status if he or she provides sufficient evidence of South Carolina residency based on the following non-exhaustive list of sources:

1. Years that the student has resided continuously in South Carolina.
2. Official high school transcript(s) showing whether the student graduated from a South Carolina high school and showing years of attendance at a South Carolina high school.
3. Possession by the student of a valid South Carolina driver's license, or if a non-driver, a South Carolina identification card.

4. Possession of a valid SC vehicle registration if the student owns a motor vehicle.
5. Proof that the student filed South Carolina tax returns as a resident for prior tax years.
6. Proof that the parent or guardian on whom the student is dependent filed South Carolina tax returns as a resident for prior tax years.
7. Other proof that the parent or guardian on whom the student is dependent is living in South Carolina, including evidence of employment in South Carolina, a lease showing a rental home or apartment in South Carolina, utility bills, and the like.

(Carullo Decl. Ex. A, ECF No. 51-2 at 3.) In sum, the Plaintiff's substantive due process claim lacks merit, and the Court grants summary judgment accordingly.

### C. Privileges and Immunities Claim

The Privileges and Immunities Clause of the Fourteenth Amendment to the United States Constitution provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States." U.S. CONST. amend. XIV, § 1. In count three of the complaint, Plaintiff alleges that "Defendants' policy and practice of classifying as a 'non-resident' a United States citizen student who resides in South Carolina, based solely on her parents' federal immigration status, deprive Plaintiff of Privileges and Immunities guaranteed citizens under the Constitution." (ECF No. 1 at ¶ 48.) Plaintiff does not plead any specific privileges or immunities of which she was allegedly deprived, and her motion for summary judgment is silent on the privileges and immunities theory of liability. (*See* ECF No. 38-1.) Furthermore, as already discussed, Plaintiff has not shown that the particular South Carolina statute and CHE regulations she is challenging are facially unconstitutional, nor has she introduced evidence sufficient to substantiate that there was a "policy and practice" of denying residency based on the illegal immigration status of one's parents.

The idiosyncrasies of the residency regulations, specifically the interaction of the

rebuttable presumption in § 59-112-20(D) and § 62-603(B) with the categorical bar to eligibility for unlawful aliens in § 59-101-430(B) and § 62-604(A), may have indeed resulted in a few U.S. citizen dependent students being denied residency status when they should not have been. In other words, it is certainly possible that institutional residency officers, not grasping the full significance of the rebuttable presumption, understood and applied the regulatory framework in an overly simplistic manner, in effect denying residency to students who could otherwise prove their residency *bona fides* simply because their parents were unlawful aliens. But an errant application of the rebuttable presumption does not a Privileges and Immunities Clause violation make. And just because statutory or regulatory language does not anticipate every conflict of a constitutional nature it may invoke, does not in itself mean such language runs afoul of the Constitution. Any lack of clarity on CHE policy has been resolved, and the controlling interpretation of the rebuttable presumption now states, "[A] U.S. citizen student who can establish domicile in South Carolina should not be denied in-state residency status on the basis of his/her parent's undocumented status." (Carullo Decl. Ex. A., ECF No. 51-2.) Accordingly, the Court grants Defendants' motion for summary judgment on Plaintiff's Privileges and Immunities Clause claim.

## CONCLUSION

After careful consideration of the parties' briefs and the associated record, the Court DENIES Plaintiff's motion for partial summary judgment and for a permanent injunction (ECF No. 38), and GRANTS Defendants' motion for summary judgment (ECF No. 40). Accordingly, Plaintiff's complaint is hereby dismissed.

**IT IS SO ORDERED.**

/s/ Bruce Howe Hendricks
United States District Judge

March 31, 2016
Greenville, South Carolina